Minute Order Form (06/97)



# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Robert W. Gettleman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 5638 | **DATE** | June 12, 2002 |
| **CASE TITLE** | Diana S. Suvannunt  v  Tommy G. Thompson, Secretary Dept. Health | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing held.
(6) ☐ Pretrial conference
(7) ☐ Trial
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]

Memorandum opinion and order entered. Accordingly, defendant's motion for summary judgment is granted with respect to each of plaintiff's claims.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | number of notices | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | | | |
| X | Notices mailed by judge's staff. | | | JUN 14 2002 date docketed | 31 |
| | Notified counsel by telephone. | | | | |
| | Docketing to mail notices. | | | docketing deputy initials | |
| | Mail AO 450 form. | | | | |
| | Copy to judge/magistrate judge | | 02 JUN 13 PM 5:14 | date mailed notice | |
| GDS | courtroom deputy's initials | OT | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DIANA S. SUVANNUNT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 00 C 5638 |
| v. ) | |
| ) | Judge Robert W. Gettleman |
| TOMMY G. THOMPSON, Secretary of the ) | |
| Department of Health and Human Services, ) | |
| Food and Drug Administration, ) | |
| ) | |
| Defendant. ) | |

**DOCKETED**

**JUN 1 4 2002**

## MEMORANDUM OPINION AND ORDER

Plaintiff Diana S. Suvannunt, acting pro se, has filed a complaint against her former employer, Tommy G. Thompson, Secretary of the Department of Health and Human Services, alleging that defendant discriminated against her during her employment on the basis of her national origin, race and gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e *et seq.*, and 42 U.S.C. §1981. Defendant has filed a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the following reasons, defendant's motion is granted.

The following facts are undisputed unless otherwise indicated.[1] The facts are arranged

---

[1] The primary source of these facts is defendant's Local Rule 56.1 Statement of Uncontested Facts, filed in support of the instant motion. Defendant points out that plaintiff's response to the motion does not comply with Local Rule 56.1(b)(3)(A) in that it does not respond to each numbered paragraph in defendant's Rule 56.1 Statement. The court agrees, but notes that, based on her filing, plaintiff does clearly contest some of defendant's asserted facts, and she proffers evidence in support of her contentions. One form of plaintiff's evidence is a diary that she allegedly kept at the time of the events in question. Defendant argues that plaintiff's diary is inadmissible hearsay that should not be considered by the court when ruling on the instant motion. Once again the court agrees with defendant. Even so, the court will consider plaintiff's assertions of fact and her evidence because she is acting pro se, and because even after considering this evidence the court concludes that it is appropriate to grant summary judgment in defendant's favor on each of plaintiff's claims.

into categories representing the actions taken by defendant during plaintiff's employment upon which plaintiff bases her discrimination claims.

## FACTS

Plaintiff was born in China but has lived in the United States since 1979. In 1983, plaintiff obtained her Ph.D. in physical organic chemistry. Effective May 31, 1992, plaintiff was offered a two-year position as a Senior Staff Fellow with the Food and Drug Administration's Center for Food Safety and Applied Nutrition, Office of Nutrition and Food Sciences in Argo, Illinois ("Argo facility"). The individual who hired plaintiff was Larry J. Maturin ("Maturin"). Maturin's supervisor throughout the relevant events was Don Kautter ("Kautter"), who has since passed away. Virgil I. Jones ("Jones") was employed at the Argo facility as a timekeeper and office manager, and he reported to Maturin.

Plaintiff was hired as part of a new program designed to conduct vitamin analyses of milk samples using, among other things, a high pressure liquid chromograph ("HPLC"). Plaintiff indicated during her interview that she had experience working with an HPLC, and also that she had experience in laboratory management, which includes ordering supplies. Maturin originally envisioned that plaintiff would take sole charge of the chemistry laboratory. Another employee assigned to work on the vitamin project with plaintiff was a Ph.D. biologist from India named Ravinder Reddy ("Reddy"). Plaintiff and Reddy both reported to Maturin.

### A. Reddy's Promotion

During the first few months of her employment, plaintiff was placed in charge of purchasing equipment and supplies necessary to operate the HPLC. According to defendant, plaintiff did not perform these tasks adequately. Much of the glassware plaintiff had ordered was unusable, some of the reagents needed were not ordered, other reagents were ordered in

2

inappropriate amounts, and some temperature-sensitive reagents were not stored properly once received. Defendant also contends that as the deadline to begin the mandated vitamin analyses approached, the Argo facility's trial runs were delayed for three months because supplies still needed to be ordered and because of operational problems with the HPLC.

Plaintiff disagrees with defendant's account and recalls one incident where Jones ordered six flasks after plaintiff had explained to him that she needed to do eight samples, requiring eight flasks. Plaintiff also points to her work revising the methods of one scientist recommended by Maturin, writing a "Standard Operating Procedure Assay for Vitamin D (HPLC Method)" and a "Standard Operating Procedure, Determination of Multiple Sulfonamide Residue (HPLC Method)."

Defendant contends that once the trial runs began, Maturin spent a great deal of time counseling plaintiff about the need to follow specific protocols, especially where regulatory matters were concerned. In these weekly meetings, defendant asserts that "many times" Maturin learned that plaintiff "had omitted critical elements or controls, which made the data plaintiff generated the previous week virtually useless." According to defendant, plaintiff's response to Maturin was that it "it was too much work to follow the protocols," and that, "the protocols were unnecessary." In March 1993, plaintiff submitted a report to Maturin stating that she was achieving 90 percent recovery of the vitamins being assayed, indicating that the system was working well and that routine analysis could begin. Defendant asserts that upon review, however, Maturin determined that plaintiff's reported values were preliminary extraction column effeciencies and not actual vitamin efficiencies. Following that discovery, defendant claims, Maturin determined that plaintiff was achieving only 10 percent recovery, indicating that procedural problems still existed and routine analysis could not yet begin.

Plaintiff maintains that she worked diligently in the lab and wrote reports to Maturin weekly. Plaintiff denies ever saying that it was too much work to follow the protocols or that the protocols were unnecessary, and asserts that the reports she wrote to Maturin prove that all the controls and standards were run according to the protocols and that she had calculated percent recoveries on twelve specific runs. Plaintiff insists that she achieved 90 percent recovery.

According to defendant, by late April 1993, Maturin learned that plaintiff still was not following protocol, still was omitting critical standards when she ran analyses, and still was not calculating percent recovery on each analysis she performed. Defendant explains that because of Maturin's concerns about plaintiff's performance, and because of an increasing number of inquiries from various government agencies about when the Argo facility would begin official testing, Maturin placed Reddy in charge of the vitamin project on June 9, 1993. Plaintiff claims that she was more qualified for the position than Reddy because she is a chemist and he is a biologist, because she had to explain calculations to him, and because she observed him commit several "technically wrong" practices in the lab. One of those allegedly wrong practices occurred the day Reddy was promoted. According to plaintiff, Reddy "used pentane outside the hood" and she inadvertently breathed the vapor. Plaintiff felt ill that evening and called in sick the following day. Upon returning to work, plaintiff asked Maturin if she could complain to the Equal Employment Opportunity Commission ("EEOC"). Maturin said "yes" and gave her the telephone number of the FDA's Equal Employment Opportunity office in Washington. The Washington office directed plaintiff to contact the Chicago office to file a complaint, which plaintiff did after her termination.

Defendant asserts that after placing Reddy in charge, the required percent recovery was determined, protocols and directives were followed, reports were completed, and Maturin gained

4

a sense of confidence in the HPLC analysis. Even so, defendant says, conflicts developed between Reddy and plaintiff in the weeks that followed Reddy's promotion.[2] Reddy complained to Maturin that Reddy met resistance when trying to pass along Maturin's instructions to plaintiff. Plaintiff refused to accept memoranda given to her by Reddy. Plaintiff also refused to follow Maturin's instruction that she consult with him before contacting people in other agencies concerning the analysis being performed. Plaintiff also disregarded Maturin's instruction that she hand-wash the glassware due to suspected chemical contamination from the glassware washer because, "it was too much work to hand wash the glassware."

## B. Performance Appraisal

In April 1993, plaintiff asked Maturin whether she would receive a performance appraisal. Maturin responded that she did not need a performance appraisal at that time because she was a staff fellow. Plaintiff argues that Appendix 1, page 4 of the "Parklawn SPO Fellowship Plan" dictates such an appraisal. The plan states:

> ...supervisors must prepare a written appraisal which evaluates research achievements and potential. The written appraisal will serve as the basis for granting extensions and or stipend increases. The appraisal may be given at a specified time on an annual basis or at the time of an appointment renewal or stipend increase.

Thus, according to plaintiff, Maturin failed to follow FDA's policy because he did not give her such an appraisal.

## C. Training Opportunities

In May 1993, plaintiff asked to attend an HPLC seminar. When she sought permission to

---

[2] Plaintiff asserts that during this time her two laboratory notebooks were stolen, which she describes as an "act of sabotage and harassment by Reddy." The court disregards this claim, however, because plaintiff has no evidence supporting her theory that Reddy was responsible.

5

leave for the seminar one hour before the seminar was to begin, Maturin responded by asking plaintiff whether she had completed her samples. When plaintiff replied that she had not finished her samples, Maturin told her that she could not go to the seminar for that reason. Reddy was allowed to attend the seminar. Plaintiff does not know whether Reddy's samples were completed prior to his departure for the seminar.

**D. Hostile Work Environment**

On February 2, 1993, Reddy asked plaintiff how to make antibiotics standards and she suggested he read a particular publication on the subject. Reddy then grabbed plaintiff's upper right arm and asked the same question again. Plaintiff says Reddy held her arm for "a minute" and defendant asserts that he held it for "five or ten seconds." Plaintiff told Reddy that he made her uncomfortable and Reddy left the room without speaking. On March 10, 1993, Reddy and plaintiff had a conflict over a keyboard and, plaintiff contends, Reddy raised his fist "to warn me he would hit me for this." On April 8, 1993, Reddy touched plaintiff's right arm with his finger and told her not to touch his computer and samples. Plaintiff responded that she would not and added, "Please don't touch me!" Thereafter, plaintiff went to Maturin and complained. Maturin told plaintiff that she has the right to prohibit anyone from touching her body. Maturin assured plaintiff that he would tell Reddy to stop this behavior. A few hours later, Reddy approached plaintiff and told her that he would not touch her again.

**E. Termination**

As early as April 1993, plaintiff sought a transfer out of the Argon facility. To that end, plaintiff wrote a letter to the FDA's San Francisco District Office. Plaintiff indicated in the letter that she sought transfer to be closer to her family. When Reddy became the project manager about two months later, plaintiff reinitiated her transfer attempt by contacting the director of the

6

San Francisco laboratory, who told plaintiff there was a hiring freeze. Next, plaintiff wrote to Ronald D. Chesemore ("Chesemore"), Associate Commissioner for Regulatory Affairs, asking for a hardship transfer because of her parents' age and health. Plaintiff did not talk to Maturin about her desire to transfer to San Francisco. When she did not get an answer from Chesemore, plaintiff called his office on at least two occasions. On July 3, 1993, Maturin received a memorandum from George R. Brubaker, who had apparently been called into action by Chesemore and his staff. The memorandum states, in pertinent part,

> I received a call from an excited Gerry Vince [("Vince")], Director, Office of Regional Operations. If you know [Vince], you know that it takes something to get wind in his sails. As it happens, one of your folks provided the propulsion, and I was delegated to make things right. Your employee, Diana, evidently would like to transfer to another locale. She seems to be serious, since she went right to the top, taking her case to [Chesemore], Associate Commissioner for Regulatory Affairs. This did not sit very well with either [Chesemore] or [Vince], who were at the time trying to put out fake fires at Pepsi-Cola bottlers worldwide, balance the federal budget, reduce the deficit, and assure a safe and wholesome diet for all Americans. My instructions were to provide you with a copy of the 2/16/93 FMD 127, "Employee Requested Transfers" which you will use as you see fit to make Diana happier.

In response, Maturin wrote a letter to Vince, apologizing "for any inconvenience that has been caused to you personally or to Associate Commissioner [Chesemore]," and explaining that plaintiff had been insubordinate for the past couple of months, that her performance in the laboratory was unsatisfactory, and that he was seeking to have her fellowship terminated. On July 31, 1993, plaintiff received a letter from Kautter stating:

> Your record of accomplishment during the time you have been a Staff Fellow with the Laboratory Quality Assurance Branch has not been sufficient to warrant continuation of your appointment. While your appointment is scheduled to expire on May 31, 1994, you are being provided notice that your appointment is being terminated effective August 20, 1993. This notice is being given to allow sufficient time for you to secure other employment.

Plaintiff told Kautter that she could not understand why her position was terminated.

7

Kautter told her that Maturin had written him a two or three page letter complaining about plaintiff. Plaintiff believes that Kautter was telling her the truth about Maturin complaining.

**F. Key and Telephone Revocation**

On the same day that Maturin wrote to Vince, Maturin asked plaintiff to give him her laboratory key and telephone. Maturin wrote a memorandum to the file in which he stated that he removed plaintiff's telephone because of her repeated calls to Chesemore, and he removed her key because he feared that she might sabotage the vitamin laboratory if allowed to enter it alone. Without a key, plaintiff had to have Jones unlock her office in the morning. Without her telephone, plaintiff had to make business calls in the laboratory and she had to borrow a telephone to make personal calls.

## SUMMARY JUDGMENT STANDARD

A movant is entitled to summary judgment under Rule 56 when the moving papers and affidavits show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Unterreiner v. Volkswagen of America, Inc., 8 F.3d 1206, 1209 (7th Cir. 1993). Once a moving party has met its burden, the nonmoving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Becker v. Tenenbaum-Hill Assoc., Inc., 914 F.2d 107, 110 (7th Cir. 1990). The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the party opposing the motion. See Fisher v. Transco Services-Milwaukee, Inc., 979 F.2d 1239, 1242 (7th Cir. 1992).

A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

8

248 (1986); Stewart v. McGinnis, 5 F.3d 1031, 1033 (7th Cir. 1993). This standard is applied with added rigor in employment discrimination cases, where issues of intent and credibility often dominate. See Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1038 (7th Cir. 1993). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." Anderson, 477 U.S. at 252.

## DISCUSSION

Title VII forbids actions taken on the basis of an individual's sex, race, or national origin if those actions discriminate against the individual with respect to her "compensation, terms, conditions, or privileges of employment." 42 U.S.C. §2000e-2(a)(1). Because plaintiff has not offered direct evidence of discrimination in responding to this motion, the court focuses entirely on the burden-shifting requirements for Title VII cases set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under the burden-shifting approach, plaintiff must establish a prima facie case by a preponderance of the evidence. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 505 (1993). Plaintiff's prima facie case must establish that: (1) she is a member of a protected class; (2) she was meeting her employer's legitimate employment expectations; (3) despite meeting the legitimate expectations of her employer, she suffered an adverse employment action; and (4) similarly situated individuals not in her protected class were treated more favorably. Gordon v. United Airlines, Inc., 246 F.3d 878, 885-86 (7th Cir. 2001).

Plaintiff's success in establishing a prima facie case creates a rebuttable presumption of discrimination, causing the burden to shift to the defendant to articulate a legitimate,

9

nondiscriminatory reason for the employment decision. See Anderson v. Baxter Healthcare Corp., 13 F.3d 1120, 1122 (7th Cir. 1994). If the defendant is successful, the presumption of discrimination dissolves, and the burden shifts back to the plaintiff to prove that the defendant's proffered reasons are a pretext for discrimination. Id. At all times, the plaintiff bears the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against her. See Hughes v. Brown, 20 F.3d 745, 747 (7th Cir. 1994).

## A. Performance Appraisal, Training Opportunities, and Loss of Key and Telephone

The court begins its analysis by addressing plaintiff's claims regarding defendant's failure to give plaintiff a performance appraisal, defendant's failure to provide plaintiff with proper training, and defendant's revocation of plaintiff's laboratory key and telephone. All of these claims are deficient for the same reason: because even assuming that plaintiff was meeting defendant's legitimate employment expectations, and also assuming that these actions can be considered adverse employment actions (both of which the court finds doubtful), plaintiff has not shown that similarly situated individuals outside her protected class were treated more favorably.

With respect to plaintiff's claim that defendant discriminated against her by failing to give her a performance evaluation, the court notes at the outset that plaintiff's claim fails on its own terms. The "Parklawn SPO Fellowship Plan," upon which plaintiff bases her claimed right to an appraisal, states that supervisors "must" prepare a written appraisal, but allows for that appraisal to be "given at a specified time on an annual basis or at the time of an appointment renewal or stipend increase." Thus, because, at the time of her termination, plaintiff had not been given a stipend increase and her Staff Fellow appointment had not expired, plaintiff's right to a performance evaluation under the plan had not yet accrued and, therefore, defendant did not violate the plan's performance evaluation requirement. Moreover, even if the court were to find

10

that defendant did violate the plan, plaintiff's claim would still fail because she has not demonstrated that defendant provided any other Staff Fellow outside her protected class with such an appraisal. The court therefore concludes that plaintiff has failed to establish her <u>prima facie</u> case with respect to her performance appraisal claim. Thus, the court grants defendant's motion for summary judgment of this claim.

Next is plaintiff's complaint that, on one occasion, Maturin allowed Reddy to attend an HPLC training seminar but told plaintiff that she could not go until she had finished her samples. Like plaintiff's appraisal claim above, this claim fails because plaintiff has not demonstrated that any other similarly situated person outside her protected class was treated more favorably. Although plaintiff points out that Reddy attended the seminar, she has not demonstrated that Reddy's samples were unfinished when he was allowed to leave for the seminar. Thus, plaintiff's training claim does not survive summary judgment either.

This leads the court to plaintiff's claim that Maturin's revocation of her laboratory key and telephone was discriminatory. As with the claims above, plaintiff fails to establish that any similarly situated individual outside her protected class was treated more favorably. Plaintiff was told, and she does not now contest, that the revocation of her telephone and keys resulted from her calls to Chesemore, which her supervisors found to be inappropriate, and Maturin's fear that she would sabotage the vitamin laboratory. Plaintiff has not pointed to any other Staff Fellow outside her protected class who made inappropriate telephone calls or demonstrated insubordinate behavior and whose phone and laboratory key were not taken away. Thus, plaintiff has not established a <u>prima facie</u> and the court must grant defendant's motion for summary judgment of this claim.

11

## B. Hostile Work Environment

Plaintiff asserts that she was subjected to a hostile work environment based on Reddy's behavior toward her—specifically the two instances in which Reddy touched her and the time he raised his fist at her. The Supreme Court has explained that, "sexual harassment is actionable under Title VII only if it is so severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment." Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 270 (2001) (internal quotations and citations omitted). The Court expounded:

> Workplace conduct is not measured in isolation; instead, whether an environment is sufficiently hostile or abusive must be judged by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. Hence, a recurring point in our opinions is that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.

Id. at 270-71 (internal quotations and citations omitted). In addition, Title VII hostile work environment claimants must show that they were singled out because of their membership in a protected class. Johnson v. Hondo, Inc., 125 F.3d 408, 415 (7th Cir. 1997).

The conduct about which plaintiff complains falls short of these standards. Being touched on the arm twice and having a fist raised in her direction cannot be described as so severe or pervasive that it altered the conditions of plaintiff's employment and created an abusive working environment. These three mild incidents, separated in time by one month each, were neither physically threatening nor humiliating, and did not unreasonably interfere with plaintiff's work performance. Moreover, no reasonable jury could find that Reddy singled plaintiff out based on her gender, race, or national origin based on facts in the instant case. It is also worth noting that as soon as plaintiff complained to Maturin about Reddy's conduct, Maturin agreed

12

with plaintiff's concerns, agreed to tell Reddy to stop this behavior, and Reddy later assured plaintiff that he would not touch her again. Taking all of the above into consideration, the court grants defendant's motion for summary judgment of plaintiff's hostile work environment claim.

**C. Promotion**

Plaintiff asserts that she was discriminated against when Maturin placed Reddy in charge of the vitamin project in June 1993. The court will treat this as a failure to promote claim, because that is the way the parties have treated it.[3] To establish a prima facie case of failure to promote, plaintiff must demonstrate that: (1) she is a member of a protected group; (2) she applied for and was qualified for the position sought; (3) she was rejected for the position; and (4) the individual promoted had similar or lesser qualifications for the job, or, in other words, was not more qualified than she. Sample v. Aldi Inc., 61 F.3d 544, 548 (7th Cir. 1995). Defendant argues that the reason Reddy was promoted instead of plaintiff is her poor work performance, which caused Maturin to lose confidence in her abilities. Defendant also asserts that once Reddy was put in charge, the laboratory ran smoothly and Maturin gained a sense of confidence in the project. Plaintiff maintains that her performance was not poor, and that Reddy was less qualified due to his biology background, his difficulty understanding calculations, and his "technical errors" in the laboratory.

Ultimately, it does not matter whether defendant or plaintiff is correct about who was more qualified. Either way, plaintiff has not established that Maturin's legitimate reason for placing Reddy in charge of the project—his belief that Reddy was more capable than

---

[3] The facts suggest that plaintiff was the person in charge of the vitamin project when Maturin promoted Reddy (or, at least, that she was the intended leader of the project when it began), making this claim more akin to a demotion claim than one for failure to promote. The distinction is not important, however, because the same outcome results under either analysis.

13

plaintiff—is a pretext for gender, race, or national origin discrimination. To demonstrate pretext, "a plaintiff must show more than that the employer's decision was incorrect, the plaintiff must also show the employer lied about its proffered explanation." Abioye v. Sundstrand Corp., 164 F.3d 364, 368 (7th Cir. 1998); see also Mills v. First Fed. Sav. & Loan Assn. of Belvidere, 83 F.3d 833, 843 (7th Cir. 1996); Mora v. Chicago Tribune, 57 F. Supp. 2d 626, 635 (N.D. Ill. 1999) (finding that "an employer need only supply an honest reason, not necessarily a reasonable one"). In the instant case, plaintiff has not asserted, much less provided evidence showing, that Maturin's reason for choosing Reddy to be the project leader was a lie. Thus, plaintiff has failed to present evidence upon which a reasonable jury could conclude that defendant's proffered reason for not promoting plaintiff was a pretext for discrimination. Accordingly, the court grants defendant's summary judgment motion with respect to this claim.

**D. Termination**

Finally, the court addresses plaintiff's claim that her termination resulted from race, gender or national origin discrimination. Defendant attacks plaintiff's prima facie case for this claim, arguing that plaintiff cannot show that she was meeting the legitimate expectations of her employer at the time she was terminated. See Gordon, 246 F.3d at 885-86. The court agrees. Plaintiff can argue that she is more qualified than Reddy as much as she wants, but that will not change the now well-established fact that Maturin was not satisfied with plaintiff's performance in the lab.

Even if plaintiff could establish her prima facie case, she cannot prove that defendant's legitimate reason for terminating her—because her record of accomplishment was insufficient to warrant continuation of her appointment—was a pretext for discrimination. The undisputed facts show that Kautter was the decision-maker who terminated plaintiff's fellowship. Kautter did so

14

after receiving a two or three page letter from Maturin listing his complaints about plaintiff. When plaintiff confronted Kautter and asked why she had been terminated, Kautter told her about the letter he had received from Maturin. Plaintiff believed that Kautter was telling her the truth about Maturin complaining and, in fact, plaintiff saw the letter Maturin sent to Kautter.[4] Perhaps most significant is the fact that plaintiff now admits that "[Kautter] believed everything that Maturin told him," indicating that even she believes Kautter's explanation for terminating her to be honest. Based on all of the above, the court grants defendant's summary judgment motion with respect to plaintiff's termination claim.

## CONCLUSION

To summarize, plaintiff has demonstrated her belief that her superiors incorrectly judged her work performance to be inadequate, and that they were insensitive or even hostile to some of her concerns. Plaintiff has failed, however, to offer any evidence that any of her superiors' actions were motivated by discrimination based on race, sex, or national origin. Thus, defendant's summary judgment motion is granted with respect to each of plaintiff's claims.

**ENTER:** June 12, 2002

_____
**Robert W. Gettleman**
**United States District Judge**

---

[4] Plaintiff testified during her deposition that she reviewed the letter Maturin sent to Kautter and that, "I think what he said there was true." Based on this testimony, defendant argues that plaintiff agrees with Maturin's complaints about her performance. Plaintiff responds that this testimony resulted from defendant's counsel putting words in her mouth and twisting her words around to suit defendant's needs. Giving plaintiff the benefit of the doubt, the court disregards this evidence.

15